**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONNA CORBELLO,<br>            *Plaintiff-Appellant*,<br><br>v.<br><br>FRANKIE VALLI; ROBERT J. GAUDIO;<br>MARSHALL BRICKMAN; ERIC S.<br>ELICE; DES MCANUFF; DSHT, INC.,<br>FKA Dodger State Holding<br>Theatricals, Inc.; DODGER<br>THEATRICALS, LTD.; JB VIVA VEGAS,<br>LP; MICHAEL S. DAVID; JERSEY<br>BOYS BROADWAY LIMITED<br>PARTNERSHIP; JERSEY BOYS<br>RECORDS LIMITED PARTNERSHIP;<br>SKUNK, INC.; GETTING HOME, INC.,<br>            *Defendants-Appellees.* | No. 17-16337<br><br>D.C. No.<br>2:08-cv-00867-<br>RCJ-PAL<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted June 11, 2019
Anchorage, Alaska

Filed September 8, 2020

Before:  A. Wallace Tashima, William A. Fletcher, and
         Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Copyright

Affirming the district court's judgment after a jury trial
in favor of defendants, the panel held that the musical *Jersey
Boys* did not infringe plaintiff's copyright in an
autobiography of Tommy DeVito, a member of the band the
Four Seasons.

The musical depicted the history of the Four Seasons.
The district court granted judgment as a matter of law on the
basis that much of the alleged infringement concerned
unprotected elements of the work, and that any infringement
of protected elements was fair use.  The panel affirmed on
the sole ground that the musical did not infringe the
autobiography, and did not reach fair use.

The panel held that facts cannot form the basis for a
copyright claim.  On close examination, each of the alleged
similarities between the musical and the autobiography were
based on historical facts, common phrases, and *scenes-a-
faire*, or elements that were treated as facts in the
autobiography and were thus unprotected by copyright, even

---

[*] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

though now challenged as fictional. Adopting an "asserted truths" doctrine, the panel held that an author who holds their work out as nonfiction cannot later claim, in litigation, that aspects of the work were actually made up and thus entitled to full copyright protection. Because the musical did not copy any protected elements of the autobiography, the panel concluded, there was no copyright infringement.

**COUNSEL**

Gregory H. Guillot (argued), Gregory H. Guillot P.C., Dallas, Texas, for Plaintiff-Appellant.

Daniel M. Mayeda (argued), Leopold Petrich & Smith P.C., Los Angeles, California; David S. Korzenik (argued) and Terence P. Keegan, Miller Korzenik Sommers Rayman LLP, New York, New York; Maximiliano D. Couvillier III and Todd Kennedy, Kennedy & Couvillier PLLC, Las Vegas, Nevada; for Defendants-Appellees.

David H. Friedlander, David H. Friedlander P.C., Mount Kisco, New York, for Amicus Curiae Dramatists Legal Defense Fund.

**OPINION**

BERZON, Circuit Judge:

The musical *Jersey Boys* depicts the history of a popular musical quartet, the Four Seasons ("the Band"), from its origins in Belleville, New Jersey, in the 1950s, to the Band's induction into the Rock and Roll Hall of Fame in 1990. Four Seasons hits such as "Walk Like a Man," "Big Girls Don't

Cry," and "Sherry" accompany the play's dialogue, recreating the Band's musical legacy on stage. *Jersey Boys* ("the Play") debuted on Broadway in 2005 and ran for over ten years, toured the country repeatedly, and was adapted as a movie in 2014.

In the late 1980s, Band member Tommy DeVito partnered with Rex Woodard to write a book telling "the whole story" of The Four Seasons. The result of this partnership was an autobiography of DeVito ("the Work"), ghostwritten by Woodard and completed before the Play was developed.

Our question is whether Four Seasons front man Frankie Valli and other defendants associated with *Jersey Boys* infringed Woodard's copyright in the autobiography, now owned by Donna Corbello, Woodard's surviving wife. After many years of litigation, including several summary judgment orders, one previous appeal, and a trial, the district court granted judgment as a matter of law ("JMOL") on the basis that much of the alleged infringement concerned unprotected elements of the Work, and that any infringement of protected elements was fair use. We affirm on the sole ground that *Jersey Boys* did not infringe DeVito's biography, and so do not reach the district court's fair use rationale.

Our decision rests primarily on "the unremarkable proposition that facts, in and of themselves, may not be form [*sic*] the basis for a copyright claim." 1 Nimmer on Copyright § 2.11(A). Although books generally contain the author's creative expression, protectable by copyright, a nonfiction biography like the work in this case is necessarily structured around historical facts and events, not themselves copyrightable. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985).

On close examination, each of the alleged similarities between the Play and the Work are based on historical facts, common phrases and *scenes-a-faire* (scenes that are "indispensable, or at least standard, in the treatment of a given idea," *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994) (internal alteration and quotation marks omitted)), or elements that were treated as facts in the Work and are thus unprotected by copyright, even though now challenged as fictional. Neither Valli nor the other defendants violated Corbello's copyright by depicting in the Play events in their own lives that are also documented in the Work. Because the Play did not copy any *protected* elements of the Work, we conclude, there was no copyright infringement.

## I. Background

### A. Factual History

Rex Woodard was an attorney, a writer, and a devoted Four Seasons fan. In 1988, Woodard agreed to ghostwrite the autobiography of Tommy DeVito, one of the original members of the Four Seasons, and to share equally in any profits arising from the book. Woodard completed the autobiography in early 1991, but he and DeVito were unable to find a publisher before Woodard's death that same year. Woodard's widow, Donna Corbello, is the successor to Woodard's interest in the Work. Corbello and Woodard's sister Cindy Ceen continued the search for a publisher after Woodard's death, still without success.

The Work reads as a straightforward historical account and is presented as an autobiography, with DeVito listed as a co-author. At the outset of the Work, the first-person narrator, whom the reader understands is DeVito, describes the book as the "complete and truthful chronicle of the Four

Seasons." The narrator contrasts the Work with assertedly inaccurate accounts that others had published, and notes his own "candor." In addition, Woodard and Corbello both emphasized in letters to potential publishers that the Work provided a behind-the-scenes factual look at the Four Seasons.

Ceen contacted DeVito in September 2005 to discuss her family's continuing interest in publishing the Work. She noted that she and Corbello were considering self-publishing the Work if they could not "attract a recognized publishing company." A few months later, DeVito's attorney told Ceen that DeVito had concluded that the Work was "not saleable."

The musical *Jersey Boys* debuted soon after. A smash hit, it garnered four Tony Awards. Hopeful that the show could renew interest in the Band, Corbello and Ceen sought to confirm the registration of Woodard's and DeVito's copyright in the Work.

The U.S. Copyright Office's records, it turned out, indicated that shortly before Woodard's death in 1991, DeVito had registered the Work solely under his own name. The copy deposited with DeVito's copyright application was identical to the Work written by Woodard with two exceptions: the title page now excluded Woodard and changed the title, and a single page in Chapter 41 was missing. Corbello was eventually able, without DeVito's cooperation, to secure recognition of Woodard as a co-author and co-claimant of the copyrighted Work; Corbello's copyright of the work was registered in 2007.

Around the same time, Corbello learned through news accounts that writers of the Play had had access to the Work while creating the production and that DeVito was profiting from the Play's success. DeVito confirmed that he had

provided a copy of the Work to individuals who were involved with developing the Play to use in their research.

## B. Procedural History

In 2007, Corbello sued DeVito for breach of contract and an equitable accounting, among other claims. The operative third amended complaint listed fourteen defendants—band members DeVito, Frankie Valli, and Bob Gaudio, as well as writers, directors, and producers of the Play (and related entities)—and twenty causes of action, including various forms of copyright infringement. DeVito subsequently settled with Corbello and is not a party to this appeal.

The district court issued summary judgment orders that, taken together, adjudicated most of the claims. The court first declared that the Work was a joint work, that Woodard was a co-owner, and that Corbello, as successor-in-interest to her husband, had a 50 percent interest in the Work. But the court then entered summary judgment in favor of all defendants other than DeVito and one producer of the Play based on its interpretation of a contract between DeVito, Valli, and Gaudio.

A panel of this court reversed in part. *Corbello v. DeVito*, 777 F.3d 1058, 1066 (9th Cir. 2015). *Corbello* held that a material issue of fact remained regarding the construction of DeVito's contract with Valli and Gaudio. *Id.* at 1064, 1066. Concurring, Judge Sack noted that "it would vastly simplify matters . . . if [on remand] the district court first decided the defendants' summary judgment motion arguing that *Jersey Boys* does not infringe the Work as a matter of law in any event, an issue which it previously avoided by granting summary judgment on contract grounds. That might be the end of the matter as far as 'Jersey Boys' Valli and Gaudio are concerned irrespective of the difficult issues that the

majority and we address here." *Corbello*, 777 F.3d at 1073 (Sack, J., concurring) (citations omitted).

On remand, the district court granted summary judgment in part, holding that, while there was substantial similarity sufficient to avoid summary judgment at least with respect to "thin" copyright protection, most of the similarities were based on historical fact or ordinary phrases, and the similarities based on protectable material were insufficient to entitle the work to regular "thick" protection as a matter of law. That ruling had large impact on the scope of the trial and on the jury instructions, as explained later, *infra* p. 11–12.

The case proceeded to trial. The jury found for Corbello on the contract issue, and, on the infringement claim, found that the Play infringed the Work, use of the Work was not fair use, and 10% of the success of the Play was attributable to infringement of the Work. The jury was not asked to calculate or award damages.

After the verdict, the district court granted the Defendant's motion for JMOL as to fair use, denied Defendant's motion for JMOL on other grounds, and granted a motion for a new trial on apportionment. This appeal followed.

We review the grant of judgment as matter of law de novo, *Spencer v. Peters*, 857 F.3d 789, 797 (9th Cir. 2017), viewing the evidence in the light most favorable to the non-moving party, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205–06 (9th Cir. 2008). Grant of new trial under Rule 59 is reviewed for abuse of discretion. *Kode v. Carlson*, 596 F.3d 608, 612–13 (9th Cir. 2010).

## II. Discussion

Some basic precepts of copyright law are at play in this case, so we begin with fundamentals.

"To qualify for copyright protection, a work must be original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (citing *Harper & Row,* 471 U.S. at 547–49). A work is original if it is created by the author with "at least some minimal degree of creativity." *Id.* Although the "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality," *Harper & Row*, 471 U.S. at 547, "[n]o author may copyright his ideas or the facts he narrates," *id.* at 556. Copyright law, in other words, protects authors' original expression in their work but does not protect ideas and facts. *Id.* at 547.

This division as to the copyright protection accorded creative expression on the one hand and the lack of such protection for facts and ideas on the other often leads to the need to delineate, with respect to the copyright protection accorded a particular work, whether the particular claim of infringement concerns the protected or the unprotected aspects of the work. "The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Feist Publ'ns.*, 499 U.S. at 348. As a result, "copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original—for example, . . . facts." *Harper & Row*, 471 U.S. at 548.

It is thus a feature of copyright law, not a bug or anomaly, that an author who deals in fact rather than fiction

receives incomplete copyright protection for the results of his labor. "The primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.'" *Feist Publ'ns.*, 499 U.S. at 349 (alteration omitted) (quoting U.S. Const. Art. I, § 8, cl. 8). "To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Id*. at 349–50 (citation omitted).

It is against this backdrop that we must evaluate Corbello's claims alleging infringement of the Work, a nonfiction autobiography. "Proof of copyright infringement requires [a plaintiff] to show: (1) that he owns a valid copyright . . . ;[1] and (2) that [the defendant] copied protected aspects of the work." *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc) (citing *Rentmeester v. Nike*, *Inc.*, 883 F.3d 1111, 1116–17 (9th Cir. 2018)).

Only the second element is here at issue. "The second prong of the infringement analysis contains two separate components: 'copying' and 'unlawful appropriation.'" *Id.* (quoting *Rentmeester*, 883 F.3d at 1117). Copying can be demonstrated either through direct evidence or "by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying," while "the hallmark of 'unlawful appropriation' is that the works share *substantial* similarities." *Id.*

Similarity only as to unprotected aspects of a work does not result in liability for copyright infringement. *See id.*; *see also Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d

---

[1] Defendants do not dispute that Corbello is a joint owner of the Work.

197, 207–08 (9th Cir. 1989). So, "[t]o determine whether similarities result from unprotectable expression, analytic dissection of *similarities* may be performed. If this demonstrates that all similarities in expression arise from use of common ideas, then no substantial similarity can be found." *Data E. USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988) (citing *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987)).

The parties' central disagreements in this case are whether the Play is substantially similar to the Work and whether the defendants copied any protectable portions of the Work. "The substantial-similarity test contains an extrinsic and intrinsic component." *Funky Films, Inc. v. Time Warner Ent. Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006), *overruled on other grounds by Skidmore*, 952 F.3d 1051. The extrinsic test requires a three-step analysis: (1) the plaintiff identifies similarities between the copyrighted work and the accused work; (2) of those similarities, the court disregards any that are based on unprotectable material or authorized use; and (3) the court must determine the scope of protection ("thick" or "thin") to which the remainder is entitled "as a whole." *Apple Computer*, 35 F.3d at 1443 (referring to what we here call "thick" protection as "broad" protection). Only if the extrinsic analysis succeeds does the so-called "intrinsic" analysis takes place. *See Funky Films*, 462 F.3d at 1077. The intrinsic test "examines an ordinary person's subjective impressions of the similarities between two works," and involves questions of fact determined by the jury under instructions as to the level of protection applicable. *Funky Films*, 462 F.3d at 1077 (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1360–61 (9th Cir. 1990)).

Applying this framework, the district court, before trial, conducted the extrinsic analysis and granted partial

summary judgment for the defendants, concluding that much of the alleged infringement in this case involved either elements original to the Play or similarities between the Play and unprotected elements of the Work, such as "historical fact[s] or ordinary phrases." Twelve alleged similarities between the Work and the Play survived this initial review and went to the jury.[2]

In its post-trial order granting JMOL for Defendants, the district court concluded that most of the twelve remaining similarities were aspects of the Work not protectable by copyright. The court undertook this analysis as part of its

---

[2] Corbello argues that the district court improperly limited the jury's consideration to twelve potentially protectable similarities, because she should have been able to seek protection for the original selection and arrangement of otherwise unprotectable elements. "We have extended copyright protection to 'a combination of unprotectable elements . . . only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship.'" *Skidmore*, 952 F.3d at 1074 (alteration in original) (quoting *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003)). "Put another way, what a selection and arrangement copyright protects is the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design." *Id*.

There is no viable arrangement and selection argument here, both because the unprotectable elements that appear in both the Play and the Work are not "numerous enough" and because, even if there were an original "synthesis" of those elements in the Work, it is not present in the Play. *See id*. The selection of the true stories behind the Band's most popular songs and the arrangement of those stories in roughly chronological order is not original, and so not protectable by copyright. The Work and the Play depict those historical events from different perspectives, with different characterizations of the people involved, in different media, and communicating a different overall message. "Without [a particular, original] arrangement, there is no liability for taking 'ideas and concepts' from the plaintiff's work, 'even in combination.'" *Id*. at 1075 (quoting *Rentmeester*, 883 F.3d at 1122–23).

conclusion that any infringement was fair use and did not explicitly frame its conclusions as rulings on infringement.

We conclude that all twelve similarities the jury considered were not infringing, some under an analysis similar to that used in the district court's order and others under what some courts have referred to as the doctrine of copyright estoppel.[3] We discuss each category in turn.

## A. Application of the Extrinsic Test to Elements of the Work that Are Undisputedly Factual

We first carefully examine whether the alleged copying or similarities are based on protectable elements of the copyrighted work. The extrinsic test for substantial similarity lays out a useful framework for this inquiry.

"Extrinsic analysis is objective in nature," and examines "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works." *Funky Films*, 462 F.3d at 1077 (internal

---

[3] We may affirm entirely on the ground that the Play did not infringe protected aspects of the Work, rather than relying at all on the district court's fair use rationale, even though Defendants did not cross-appeal the infringement verdict. "An appellee who does not take a cross-appeal may 'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court.'" *Jennings v. Stephens*, 135 S. Ct. 793, 798 (2015) (quoting *United States v. Am. Ry. Express Co.,* 265 U.S. 425, 435 (1924)). The appellee must file a cross-appeal only if he is "attack[ing] the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." *Id*. Our decision will neither enlarge Defendants' rights nor lessen Corbello's. The district court granted judgment in favor of Defendants. As a result of our affirmance on alternative grounds, it remains true that Defendants are not liable to Corbello, so all parties remain in the same position they were as a result of the district court's judgment.

quotation marks omitted). "Protectable expression includes the specific details of an author's rendering of ideas. . . . [The court] must take care to inquire only whether the *protectable elements, standing alone*, are substantially similar. In so doing, we filter out and disregard the non-protectable elements." *Id.* (citations and internal quotation marks omitted). Non-protectable elements include ideas; historical facts; common phrases; *scenes-a-faire* (that is, "situations and incidents that flow necessarily or naturally from a basic plot premise" or generic plot line) and "[f]amiliar stock scenes and themes that are staples of literature." *Benay v. Warner Bros. Ent., Inc.*, 607 F.3d 620, 624–25 (9th Cir. 2010) (citations omitted), *overruled on other grounds by Skidmore*, 952 F.3d 1051; *see also Narell v. Freeman*, 872 F.2d 907, 910–11 (9th Cir. 1989).

As the district court correctly summarized,

> [t]he Work is a work of historical fact, as recounted by DeVito with the assistance of Woodard's writing skills. The creative aspects of the Work do not generally concern things like character, plot, and setting, but rather writing style and presentation. Neither DeVito nor Woodard created or even claimed to have created any characters, plot lines, settings, etc.

Though the creative expression that is in the Work—the "writing style and presentation"—is protected by copyright, the assertedly historical elements are not.

Each of the six similarities between the Play and the Work discussed below fails the extrinsic test for substantial similarity because each involves only non-protectable elements of the Work.

### 1. Tommy DeVito's Introduction

Chapter One of the Work introduces Tommy DeVito "hanging out on a Jersey Street Corner" with his friends, "puff[ing] on cigarettes and dar[ing] anyone to mess with [them,] . . . cool beyond belief." At the outset of the Play, the DeVito character addresses the audience, his cool demeanor on display. Corbello alleged that this description of DeVito is substantially similar to the one in the Play and so infringing. But DeVito is not a fictional character whose personality was created in the Work. This depiction of DeVito—as Corbello's expert put it, his "voice, cool demeanor, and braggadocio"—is not original to the Work, and so not a protectable element. *See Benay*, 607 F.3d at 627. A character based on a historical figure is not protected for copyright purposes. *Id*.

### 2. Introduction of the Song "Sherry"

Both the Play and the Work depict Bob Gaudio arriving late to a rehearsal excited about a new song he just wrote, "Sherry," which—no surprise—became a major hit. In the Work, DeVito recalls that he liked the song but "didn't think [they] could get away with it," because it was "clearly intended for someone younger than us." In the Play, DeVito says it was a "fuckin' insult" that Gaudio arrived late "with some bullshit song he wrote fifteen minutes ago." As the district court concluded, "[t]he dialogue is completely different, as is DeVito's initial reaction to the song." The only similarities are unprotectable historical facts: Gaudio wrote the song at the last minute, he was late to rehearsal, and the song was ultimately successful. *See Narell*, 872 F.2d at 912.

### 3. Introduction of the Song "Big Girls Don't Cry"

The Work recounts that Bob Crewe, a producer and songwriter who worked with the Four Seasons, was inspired to write the song "Big Girls Don't Cry" after watching a movie in which a female character dramatically says exactly that—"big girls don't cry." In the Play, Gaudio tells the audience a transformed version of this story—Gaudio was the person who saw the movie, it was a John Payne movie, and Rhonda Fleming was the actress who delivered the line. Both the Play and the Work report that Crewe and Gaudio co-wrote the song. As the district court correctly concluded, the "only similarity is the unprotectable historical fact that the song was inspired by the Rhonda Fleming line." That similarity does not include any protectable element of the Work.[4] *See Narell*, 872 F.2d at 912.

### 4. Comparisons between the Four Seasons and the Beatles

The Work states that "[i]n the Beatles we are not just competing against another band; the Beatles come to represent a whole social movement. [The Four Seasons] never aspire to be more than entertainers." In the Play, the Gaudio character describes the competition between the Band and the Beatles, telling the audience,

---

[4] In writing the Work, Woodard relied on notebooks he had assembled containing research and articles about the Four Seasons. His research notebooks included an article that quoted Gaudio telling this story. Just as Woodard, writing the Work, was able to recount historical events documented in another author's work, it is not infringement for the writers of the Play to use the Work as a source for this historical event.

> We weren't a social movement like the Beatles. Our fans didn't put flowers in their hair and try to levitate the Pentagon. Maybe they should have. Our people were the guys who shipped overseas . . . and their sweethearts. They were the factory workers, the truck drivers. The kids pumping gas, flipping burgers. The pretty girl with circles under her eyes behind the counter at the diner. They're the ones who really got us, who pushed us over the top.

The similarities between the Work's allusions to the Beatles and the longer, more detailed and more evocative comparison in the Play are the words "social movement" and the unprotectable historical fact that the two music groups competed for record sales and chart placements. *See Harper & Row*, 471 U.S. at 556. Even if the Work was the first to describe the Beatles as representing a "social movement"—which is neither proven nor disproven in the record—this concept is an idea unprotectable by copyright. *See id.* The expression of that idea could be protected if it was original to the Work, but use of the phrase "social movement" is all but inevitable in the presentation of that idea. The words "social movement" thus form an unprotectable common phrase describing an idea. "Ordinary phrases are not entitled to copyright protection." *Narell*, 872 F.2d at 911. *Grosso v. Miramax Film Corp.*, 383 F.3d 965 (9th Cir.2004), for example, held that there was no substantial similarity where "the only similarities in dialogue between the two works come from the use of common, unprotectable poker jargon," *id.* at 967.

### 5.  Introduction of the Song "Dawn"

The Work recounts that the Beatles had "hit the public consciousness like a load of bricks" when the Four Seasons song "Dawn" was ready for release. The Work then goes on to describe competition between the two bands in the Billboard charts, noting that "Dawn" charted third, "sandwiched in by the Beatles at number one, number two, number four and number five!"

In the Play, Gaudio says, "Around this time, there's a little dust-up called the British Invasion. Britannia is ruling the airwaves. So we start our own American Revolution. The battle begins on a Sunday night at eight o'clock, and the whole world is watching." The scene shifts to historical footage of Ed Sullivan introducing the Band, which then performs "Dawn."

Again, it is an unprotectable historical fact that the Beatles and the Four Seasons generally competed for chart placement. That "Dawn" charted against songs by the Beatles is similarly an unprotectable historical fact. *See Narell*, 872 F.2d at 912. No protectable elements of the Work share any similarity with the "American Revolution" scene in the Play.

### 6.  Description of the Rock and Roll Hall of Fame Induction Ceremony

Both the Play and the Work depict the Four Season's induction into the Rock and Roll Hall of Fame in 1990. The Band's members reunited at the induction ceremony and performed for the first time in many years. These historical events are not protectable by copyright. *See Harper & Row*, 471 U.S. at 556; *Narell*, 872 F.2d at 912.

In the Work, DeVito describes "reunit[ing] with Frankie Valli, Bob Gaudio, Nick Massi and Bob Crewe for the first time since 1965. I felt like I was stepping from a time machine." In the play, as the Band performs, DeVito asks, "Is this like being in a fuckin' time machine, or what?" The idea that band members performing together after many years apart would evoke the feeling of a time machine flows naturally from the plot premise of a band reuniting and is classic *scenes-a-faire*. *See Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002). And as the district court correctly ruled, the words "time machine" constitute an ordinary phrase and so is not protectable. *See Narell*, 872 F.2d at 911; *Grosso*, 383 F.3d at 967.

## B. Application of the Extrinsic Test to Claimed Fictions Represented to be Facts—So-Called "Copyright Estoppel"

Other circuits, and district courts in this circuit, have employed a doctrine of copyright law sometimes called "copyright estoppel." Under the doctrine, elements of a work presented as fact are treated as fact, even if the party claiming infringement contends that the elements are actually fictional. An author who holds their work out as nonfiction thus cannot later claim, in litigation, that aspects of the work were actually made up and so are entitled to full copyright protection. *See Nash v. CBS, Inc.*, 899 F.2d 1537, 1541 (7th Cir. 1990); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2nd Cir. 1980); *Idema v. Dreamworks Inc.*, 162 F. Supp. 2d 1129, 1183 (C.D. Cal. 2001); *Houts v. Universal City Studios, Inc.*, 603 F. Supp. 26, 30–31 (C.D. Cal. 1984); *Lake v. Columbia Broad. Sys.*, 140 F. Supp. 707, 708–09 (S.D. Cal. 1965); *Oliver v. Saint Germain Found.*, 41 F. Supp. 296, 299 (S.D. Cal. 1941). "Given an express representation that the work is factual, the

case law indicates that the author will be estopped from claiming fictionalization, even if most readers would not believe the representation." 1 Nimmer on Copyright § 2.11. Claimed fictions that have been treated as facts for copyright purposes under this approach include a novel hypothesis about the cause of the Hindenburg explosion, *Hoehling*, 618 F.2d at 978–79; a theory that John Dillinger was not killed by law enforcement and instead retired to the West Coast, *Nash*, 899 F.2d at 1538, 1541; a "true crime" book with fantastical stories, *Houts*, 603 F. Supp. at 30; and representations that the author was the scribe of a spiritual power, *Oliver*, 41 F. Supp. at 297.

In legal parlance, "estoppel" encompasses various equitable doctrines that ordinarily include as an element detrimental reliance. *See, e.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099 (9th Cir. 2009), *as amended* (Sept. 28, 2009); *see also* Restatement (Second) of Contracts § 90 (1981). "Estoppel" is not, in our view, an apt descriptor for the doctrine at work here. For one thing, as the court correctly observed in *Houts*, detrimental reliance is not an element of this doctrine, as "the [so-called] estoppel [is] created solely by plaintiff's affirmative action and representation that the work was factual." 603 F. Supp. at 31. For another, application of estoppel concepts often suggests that the party against whom estoppel is applied is in some way culpable. *See, e.g.*, *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000) (equitable estoppel looks to "evidence of improper purpose on the part of the defendant"); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (judicial estoppel "protect[s] against a litigant playing 'fast and loose with the courts'" (quoting *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1311 (9th Cir. 1989) (Hall, J., dissenting))).

There are core concerns of copyright law, not equitable or estoppel principles, that, in our view, animate the misnamed "copyright estoppel" analysis. "[C]opyright . . . encourages others to build freely upon the ideas and information conveyed by a work," *Feist*, 499 U.S. at 349–50, "'[t]o promote the Progress of Science and useful Arts,'" *id.* at 349 (quoting U.S. Const. Art. I, § 8, cl. 8). It would hinder, not "promote the progress of science and useful arts" to allow a copyright owner to spring an infringement suit on subsequent authors who "buil[t] freely" on a work held out as factual, contending after the completion of the copyrighted work, and against the work's own averments, that the purported truths were actually fictions. *Id.* at 350. Copyright protects the creative labor of authors; it does not protect authors' post-completion representations about the lack of veracity of their own avowedly truthful work.

We find this copyright-grounded rationale for this principle compelling and so adopt the doctrine. Rather than "copyright estoppel," we will refer to this rule of copyright law as the "asserted truths" doctrine, because it is the author's assertions within and concerning the work that the account contained in the book is truthful that trigger its application.

Here, the text of the Work explicitly represents its account as historically accurate, not historical fiction. In the Work's early pages, the DeVito narrator describes the Work as the "complete and truthful chronicle of the Four Seasons." He promises not to allow "bitterness to taint the true story," and notes his "candor." Both Corbello's husband and she herself sent potential publishers cover letters emphasizing that the Work provided a behind-the-scenes factual look at the Band, promising "disclosure[]" of "the truth about" several events, including the "secret past that these

performers successfully hid for almost three decades." Consistent with those promises of truthfulness, the Work reads as a straightforward historical account and is presented as an autobiography, with DeVito listed as a co-author. So the Work was expressly and repeatedly held out as a factual account.[5]

Corbello argues strenuously that the asserted truths doctrine cannot apply in this case because the Work was never published. She argues that only representations of truth made *to the public* trigger the asserted truths doctrine, and that there was no representation to the public because the Work was unpublished.

This suggested limitation of the asserted truths doctrine to published works has no basis in either the case law or the doctrine's copyright law foundations. As to the case law, Corbello does not point to any case supporting the limitation, and we are not aware of any. One district court, in an unpublished opinion, characterized the doctrine as "normally applied to . . . a plaintiff who represented *to the public* that his work was factual." *Garman v. Sterling Pub. Co.*, No. C-91-0882 SBA (ENE), 1992 WL 12561293, at *3 (N.D. Cal. Nov. 5, 1992) (emphasis added). Aside from the nonbinding nature of its source, this passing reference to "the public," does not suggest that publication is a prerequisite to the application of the asserted truths doctrine; "the public"

---

[5] We note that the asserted truths doctrine would not cover fictional works that use claims to truthfulness as a literary device, like the Orson Welles radio broadcast of "War of the Worlds." *See Terror by Radio*, N.Y. Times, Nov. 1, 1938, at A22. We are not required, in this case, to decide what the outer limits should be of the test for whether a work's representations for truthfulness are sufficient to support the application of this rule. We hold only that the representations here are definitely sufficient.

could include actual or intended readers of work, including works not mass produced for sale.

As to the copyright origins of the doctrine, the suggested publication limitation appears to rest on the detrimental reliance and culpability concepts connected to the "estoppel" locution.  But we have rejected both the terminology and its related implications as not pertinent to the asserted truths copyright principle as we understand it.

Rather than treat prior publication as dispositive, we examine the representations made by a work, whether made only to a few actual readers, to future intended readers, or, upon publication, to the general public. In this case, again, the Work made unequivocal representations of truthfulness. The Work's emphatic and express representations of truthfulness were made both to potential publishers and to readers of the unpublished manuscript, as well as to future readers of the Work if published. Those representations were, as described earlier, central to the manuscript's claim to readers' attention and appreciation. And the representations applied to the book as a whole, a consideration emphasized in the case law. In *Houts*, for example, the district court stressed that the book had been held out as *completely* factual, because its jacket described the book as containing "*real life* detective stories," the book had the notation "N-F" for nonfiction on its spine, and the first page proclaimed that the book "shows that truth can be more brutal than fiction." 603 F. Supp. at 28–29 (emphasis in original). Similarly, *Lake* held that a plaintiff could not claim copyright protections for portions of a book about Wyatt Earp as fictionalized because the book's preface promised "an accurate historical biography based on a factual account of Wyatt Earp's career [that was] 'in no part a mythic tale.'" 140 F. Supp. at 708.

Just as the court in *Houts* determined that "[g]iven these broad and inclusive representations [that the book is factual], the reader is compelled to conclude that the *entire book* is true," 603 F. Supp. at 29, here the Work presents itself to the reader as a reliable source of factual information about the Four Seasons. So, when DeVito, an owner and co-author of the book, gave it to the Play's writers as they researched the history of the Four Seasons, they had reason to view it as a factual source, even better than newspaper or magazine articles, because it was co-written by a participant in the events described. Whether a Work is published may inform how its readers perceive and evaluate any claims of truthfulness—for example, a reader may discount such claims made in an unpublished work that appears to be an unfinished draft, or find assertions that a book is nonfiction particularly compelling if the publisher has a strong reputation for fact-checking its publications. But publication alone is not dispositive of whether this doctrine applies.

Relatedly, the asserted truths doctrine applies not only to the narrative but also to dialogue reproduced in a historical nonfiction work represented to be entirely truthful. As detailed above, even dubious assertions of truthfulness can prevent an author from later claiming that part of a work is fiction. *See, e.g.*, *Oliver*, 41 F. Supp. at 297, 299. The asserted truths doctrine thus includes dialogue that an author has explicitly represented as being fully accurate, even if the author was unlikely to have recalled or been able to report the quotations exactly. Courts have applied the doctrine to, for example, dialogue surrounding the death of Pope John Paul, *see Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 595 (S.D.N.Y.), *aff'd*, 351 F. App'x 516 (2d Cir. 2009), and to other purportedly accurate conversations, even where the author "could not possibly have been present to experience" them, *Houts*, 603 F. Supp. at 30.

As the court observed in *Houts*, this dialogue corollary follows from "the very nature of biographical works that involve any historical perspective. All historical renditions would be deemed fictionalized under [a contrary] theory merely because the author was not there personally." *Id*. Requiring readers of purported nonfiction to investigate the accuracy of each quoted statement in a work that presents itself as completely true and accurate nonfiction would frustrate the pro-creation goals of copyright law. "To avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter." *Hoehling*, 618 F.2d at 978.

There may be instances in which extensive dialogue—for instance, dialogue in a biography of an ancient politician—necessarily indicates that a work is partially fictional. But this is indubitably not such a case. Here, the Work purports to accurately document conversations in which its co-author, DeVito, *actually participated*. Because of the autobiographical representation that is central to the Work, the assertions of accuracy carry extra force, and the asserted truths doctrine applies to the dialogue as well as to the narrative.

Each of the six similarities between the Play and the Work we next discuss fail the extrinsic test for substantial similarity because, whether or not actually factual, they involve—sometimes in combination with other non-protected features—elements of the work held out as facts and so not protectable.

### 1.  DeVito's Introduction of Valli to Mary and Mary's Characterization

In the Work, Valli first sees Mary Mandel, a friend of DeVito's current girlfriend, while hanging out with DeVito at a "hotdog joint." Valli asks DeVito about her; DeVito reports that Mary is several years older than Valli, has a daughter, and "comes from a rotten family; her two brothers are junkies and a lot of her people are in prison. She talks kind of rough herself, but she seems nice."

In the Play, Valli notices Mary Delgado—a composite character of two of Valli's ex-wives—at a show, and DeVito warns him away but ultimately introduces them. Valli then takes Mary on a date. No dialogue is alleged to have been copied. The only similarity between the two accounts is the fact that Valli asked DeVito about a woman named Mary.

The Work and the Play characterize Mary and her relationship with Valli very differently. The Work depicts Mary Mandel as "mean spirit[ed]" and highly critical of Valli, causing him to become more reserved and "quenching the sparkle in his eye." The Play does not portray Mary Delgado negatively, although it does depict an argument between Valli and Mary before the couple divorces. Gaudio reports to the audience that Valli told the other band members his divorce was "for the best," but they knew "that wasn't the whole story"; Valli's character then sings a love song, indicating he had loved Mary and was sad about the divorce.

As the district court correctly concluded, "the Play copied no creative expression from the Work in relation to Valli's introduction to or relationship with Mary. The Play used its own creative expression in telling the story of Valli's interest in Mary, DeVito having warned him away, and any

conflict between Valli and Mary. The historical facts of these events are not protectable by copyright."

At his deposition, Valli testified that DeVito did not in fact introduce him to Mary Mandel, and that he couldn't remember whether DeVito helped set them up. Whether Valli's recollection is correct or not does not affect whether the Work's version is protectable as an original creation of the writers. DeVito may have remembered events differently than Valli did, or he may have reported his memory to Woodard inaccurately, or he or Woodard may have invented the story that he introduced Valli and Mary. Any such inconsistency, inaccuracy, or invention does not transform what was represented in the Work as a completely truthful account into creative fiction protectable by copyright. Facts presented in a historical work, "whether correct or incorrect," may be used by subsequent authors without infringing. *Hoehling*, 618 F.2d at 979; *see also Idema*, 162 F. Supp. 2d at 1183. As the Work holds it out as true that DeVito talked to Valli about Mary, that asserted fact is unprotectable under copyright law.

### 2.  DeVito's Intercession After Valli's Arrest

Both the Play and the Work relay a story about DeVito helping Valli after he was arrested. In the Work, DeVito says that "Frankie Valli and a kid named Lamonica get arrested for stealing. [Valli's mother] calls me very worried, so I tell her I'll look into it. She's terrified Frankie will get sent away." DeVito knows the probation officer writing Valli's presentence report and convinces him to recommend probation. In the Play, DeVito promises Valli's mother he will watch out for him, then pressures Valli to join DeVito in robbing a jewelry store. After they are caught, DeVito tells the judge, "Your Honor. Please. The kid didn't know what

he was doing. I conned him into it." Valli gets probation and DeVito goes to prison.

The only similarities are the unprotectable historical fact of intervention by DeVito on Valli's behalf and Valli's probation sentence. That Valli testified at his deposition that neither story is accurate does not change this analysis. Again, if DeVito's memory of events differs from Valli's, then the account in the Work is either inconsistent with Valli's, but accurate, or it is inaccurate. Either way, it is not protectable creative fiction. *See Hoehling*, 618 F.2d at 978–79. As the Work holds it out as true that DeVito helped Valli, that asserted fact is not copyright protectable.

### 3.   The "Roman Orgy" Scene

Both the Work and the Play depict a party the record label threw for the Band during their first nationwide tour. At the party, DeVito encourages a shy Gaudio to approach a girl. The Work compares the party to "a Roman orgy," and describes a naïve and embarrassed Gaudio sitting on the ground "look[ing] like he is going to throw up." DeVito asks, "'What're you doing? Grab a girl and have a good time.' . . . [Gaudio] eventually gets up and leaves with one of the girls. He reminds me of a condemned man leaving for his last meal. I didn't know whether it was from his youth or shyness, but Gaudio is definitely not in a party mood."

The Play takes a more graphic approach. The party scene is set to the song "December, 1963 (Oh, What a Night)." DeVito tells Gaudio to "grab some Christmas cheer," and Gaudio is approached by a girl and eventually loses his virginity off stage, with DeVito and Massi reporting his progress to the audience using space travel metaphors.

As the district court correctly noted, that the party took place is an unprotectable historical event. That is also true of the account that Gaudio left the party with a girl. The only similar dialogue in the two accounts are the "grab a girl"/"grab some Christmas cheer" lines, which share only the word "grab." This loose similarity does not involve any protectable elements of the Work, both because the Work represents as historical fact that DeVito told Gaudio to "grab a girl," and because "grab a girl"—actually, "grab"—is an unprotectable ordinary phrase. *See Narell*, 872 F.2d at 911.

### 4.  Fake Murder in Valli's Car

The Work and the Play both depict an incident in which some men attempt to extort money from Valli after staging a fake murder in his car. In the Work, Valli's car is being driven by a friend, and Valli and two other people are passengers. An argument between the two men in the front seat ends when the passenger says, "Well, asshole, what do you plan to do about it?" and the driver shoots him. A few days later, the driver and the other passenger ask Valli for money in exchange for their silence. Valli turns to DeVito, who contacts Ray DeCarlo, a mobster. DeCarlo says he knows the men, assures Valli it was a scam and that the man was not really killed, and arranges for Valli's car to be returned to him unharmed two days later. The Play recounts a version of the same story, and the "victim" similarly says, "Yeah, asshole, what're you gonna do about it?" before being shot.

The incident itself is an unprotectable historical event, *see Narell*, 872 F.2d at 912, and Valli himself has told the story many times, including to the writers of the Play. The only similar expression is the "asshole" line. That line alone is unprotected by copyright because the Work holds it out as historically accurate dialogue. The Play may have "taken

facts and ordinary phrases from [the Work], but [it] has not taken protected expression." *Id.*

>   ### 5. and 6.   The Dialogue Surrounding the Song Title and Subject Matter of the Song "Walk Like a Man"

The Work and the Play feature a similar portrayal of the origin of the title of the song "Walk Like a Man," written by Gaudio. The Work describes the Band kidding Gaudio about the title but does not attribute the teasing to a specific person:

>   "'Walk Like A Man?'. As opposed to what — like a woman?"

>   "No, no," explains Gaudio defensively, "the song is directed to teenage boys who need to walk and talk like men."

>   "In other words, instead of like girls."

>   "No! Instead of like boys. This song is going to serve as an anthem for every teenage boy who has let some girl twist him around her little finger!"

The Play features similar dialogue, but portrays DeVito as mocking Gaudio rather than playfully teasing him:

>   TOMMY: I don't get it.

>   BOB: What don't you get, Tommy?

>   TOMMY: The title, Walk like a man. . . . As opposed to what — a woman?

> BOB: It's for boys, Tommy. Teenage boys. We're telling them to act like men.
>
> TOMMY: Instead of like girls.
>
> BOB: Instead of like *boys*. Why are you doing this?
>
> CREWE: Look, Miss Congeniality — it's a *metaphor*. This is an anthem for every guy who's ever been twisted around a girl's little finger!

The parties do not dispute that this conversation actually happened, so the event itself is not protectable. They do dispute whether the particular language used in the Work was original expression, rather than a report of what was actually said. Corbello claims that the dialogue was "Woodard's invented banter," and thus protected expression. DeVito testified that he did not remember supplying Woodard the words "anthem" or "twisted around a girl's finger." Gaudio testified that the dialogue does reflect the substance and language of the actual conversation, and that he described the argument using these phrases to the writers of the Play.

We need not resolve this factual dispute. Whether the dialogue accurately represents what was actually said does not change our analysis. The dialogue is held out by the Work as a historically accurate depiction of a real conversation. The asserted facts do not become protectable by copyright even if, as Corbello now claims, all or part of the dialogue was made up.

## III.    Conclusion

Given the Work's emphatic representation that it is a nonfiction autobiography, the Play did not infringe on any of the protected expressive elements of the Work, even if the writers of the Play "appropriated [Woodard's] historical research." *Narell*, 872 F.2d at 911. As the similarities between the Play and the Work involve only elements of the Work not protected by copyright, we affirm the district court's grant of JMOL.[6]

**AFFIRMED.**

---

[6] Because we affirm, we do not reach the questions whether the district court erred in granting JMOL that Valli and Gaudio had not committed infringement, whether the district court abused its discretion in ordering a new trial, or whether this case should be reassigned to another district judge.