**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHOSH YONAY, an individual; YUVAL YONAY, an individual, | No. 24-2897 |
| | D.C. No. 2:22-cv-03846-PA-GJS |
| *Plaintiffs - Appellants*, | |
| v. | |
| | OPINION |
| PARAMOUNT PICTURES CORPORATION, | |
| *Defendant - Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted June 3, 2025
Pasadena, California

Filed January 2, 2026

Before: Andrew D. Hurwitz, Eric D. Miller, and Jennifer
Sung, Circuit Judges.

Opinion by Judge Miller

# SUMMARY[*]

## Copyright

The panel affirmed the district court's grant of summary judgment for Paramount Pictures Corporation in an action brought under the Copyright Act by Shosh and Yuval Yonay, owners of the copyright in "Top Guns," a 1983 magazine article by Ehud Yonay about the United States Navy Fighter Weapons School, popularly known as "Top Gun."

Plaintiffs alleged that Paramount's 2022 movie *Top Gun: Maverick*, a sequel to the 1986 movie *Top Gun*, infringed their copyright. The panel affirmed the district court's conclusion that *Maverick* did not share substantial amounts of the original expression of "Top Guns," and plaintiffs therefore failed to establish a triable issue as to substantial similarity, as required to establish copyright infringement. The panel concluded that there was a lack of similarity in protectable elements of the article, and plaintiffs did not establish an original and protectable selection and arrangement of elements.

The panel held that the district court did not abuse its discretion in excluding plaintiffs' expert and allowing Paramount's expert.

Finally, the panel held that the district court properly granted summary judgment for Paramount on plaintiffs'

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

claim that Paramount breached its 1983 agreement with Ehud Yonay by not crediting him in the 2022 movie.

## COUNSEL

Alex Kozinski (argued), Law Office of Alex Kozinski, Rancho Palos Verdes, California; Jaymie Parkkinen and Marc Toberoff, Toberoff & Associates PC, Malibu, California; for Plaintiffs-Appellants.

Molly M. Lens (argued), Daniel Petrocelli, Danielle R. Feuer, and Matthew Kaiser, O'Melveny & Myers LLP, Los Angeles, California, for Defendant-Appellee.

Stefan C. Love, Greines Martin Stein & Richland LLP, Los Angeles, California, for Amicus Curiae National Society of Entertainment and Arts Lawyers.

**OPINION**

MILLER, Circuit Judge:

Shosh and Yuval Yonay own the copyright in "Top Guns," a 1983 magazine article by Ehud Yonay about the United States Navy Fighter Weapons School, popularly known as "Top Gun." They sued Paramount Pictures Corporation, alleging that its 2022 movie *Top Gun: Maverick* infringed that copyright. "Top Guns" and *Maverick* do share some similarities because they both depict the Navy's real fighter-pilot training program. But copyright plaintiffs must show more than an allegedly infringing work's general similarity to their own. They must show that what is similar is their original expression. Because *Maverick* does not share substantial amounts of the original expression of "Top Guns," we affirm the district court's grant of summary judgment for Paramount.

I

In 1983, *California Magazine* published "Top Guns," an 11-page article by Ehud Yonay about the Fighter Weapons School, later renamed the Strike Fighter Tactics Instructor Program, a Navy program that teaches advanced air-combat tactics. (We refer to Ehud Yonay as "Yonay" and to Shosh and Yuval Yonay, Yonay's heirs and the plaintiffs here, as "the Yonays.") The article discusses the history, culture, and setting of the Top Gun program and vividly describes the experience of flying F-14 aircraft. It focuses on two lieutenants, callsigns "Yogi" and "Possum," describing their decisions to become fighter pilots and their experiences in naval aviation and the Top Gun program. The article is written in a style that the Yonays refer to as "'New Journalism,' where writers use extensive imagery and

subjective expression to present facts with the colorful voice of fiction." A representative passage is one of the article's first descriptions of Yogi and Possum flying:

> From where they sit, however, it's not their silver rocket that's rocking but the entire vast blue dome of sea and sky. There are no ups or downs up here, no rights or lefts, just a barely perceptible line separating one blue from another, and that line is spinning and racing like mad in the distance. Yogi was still in junior high school when he realized that flying straight and level might be okay for some people, but if you like yanking and banking—the feeling of riding inside one of those storm-in-a-bottle souvenirs—then there's just one place for you, and that's the cockpit of a fighter plane.

Shortly after "Top Guns" was published, Yonay granted Paramount all rights to the article. In return, Paramount paid Yonay a fixed sum of money and agreed to credit him in any movies "produced by [Paramount] hereunder and substantially based upon or adapted from" the article.

In 1986, Paramount released the feature-length movie *Top Gun*, whose credits state that it was "[s]uggested by" Yonay's article. *Top Gun* enjoyed great commercial success and was the top-grossing movie of 1986.

The film follows two Navy lieutenants, callsigns "Maverick" and "Goose," through their experience at Top Gun. Maverick competes with another lieutenant, callsign "Iceman," to be the top trainee. After Goose dies in an accident while Maverick is flying, a guilt-ridden Maverick

considers quitting. But he continues in the program, eventually graduating with his class. He and Iceman are then deployed for a dangerous mission. Maverick shoots down three enemy aircraft, befriends Iceman, and makes peace with his guilt over Goose's death.

After Yonay died in 2012, his widow Shosh and his son Yuval became the owners of the copyright in "Top Guns." In 2020, they terminated Yonay's agreement with Paramount by invoking 17 U.S.C. § 203(a)(3), which allows an author's heirs to terminate certain copyright grants made during his lifetime.

Two years later, in 2022, Paramount released *Top Gun: Maverick*, a sequel to the original movie. *Maverick* picks up decades after *Top Gun* left off. The eponymous pilot is now a captain, while Iceman, now an admiral, commands the U.S. Pacific Fleet. After Maverick crashes an experimental hypersonic jet, Iceman sends him back to Top Gun to train a group of program graduates for a mission to destroy a foreign enemy's uranium-enrichment plant. One of those graduates is Goose's son, callsign "Rooster," who resents Maverick because Maverick blocked his application to the Naval Academy in an effort to protect him from suffering his father's fate.

The pilots train by flying on a course that simulates the topography surrounding the uranium plant, but none of the trainees can complete the course while flying quickly enough to avoid attack by enemy aircraft. Iceman dies of cancer, and Maverick, inspired by Iceman, takes an unauthorized flight through the course and demonstrates that it is possible to complete the mission in time. Based on that performance, Maverick is selected to lead the mission, and he decides that he will lead one flight team and Rooster will

lead the other. While all of that is going on, Maverick pursues a romance with Penny Benjamin (mentioned in the original *Top Gun* when Maverick's commanding officer noted his "history of high-speed passes over five air-control towers and one admiral's daughter").

During the mission, Maverick protects Rooster from enemy missiles but is shot down in the process. Just when an enemy helicopter is about to shoot Maverick on the ground, Rooster returns, saves Maverick by destroying the helicopter, and is himself shot down. Maverick and Rooster, now both on foot, steal an F-14 from an enemy air base and begin flying back to their aircraft carrier. On the way, however, they are intercepted by enemy aircraft. They appear to be doomed, but one of the other Top Gun graduates flies in and saves the day. The three return to the carrier in triumph, with Maverick and Rooster having resolved their differences. At the end of the movie, Maverick and Penny fly Maverick's personal plane into the sunset.

Like its predecessor, *Maverick* was a major commercial success. Paramount did not compensate the Yonays or credit Yonay in the film.

After *Maverick*'s release, the Yonays sued Paramount in the Central District of California, asserting claims for copyright infringement and breach of contract. The district court denied a motion to dismiss but later granted Paramount's motion for summary judgment. The court concluded that "Top Guns" and *Maverick* are not "substantially similar," as required to establish copyright infringement. While the works have "some similarities," the court explained, those similarities are "based on unprotected elements" like facts about the Top Gun program, "general plot ideas, [and] familiar stock scenes and themes."

In resolving the copyright claim, the district court excluded the proffered opinion of the Yonays' literary expert, Henry Bean, finding that Bean had "fail[ed] to filter out the elements of the Article and [*Maverick*] that are not protected by copyright law (i.e., facts), which renders his opinions unhelpful and inadmissible." The court denied a motion to exclude Paramount's expert, Andrew Craig, a former Top Gun instructor who described the factual accuracy of "Top Guns." Craig's opinions, the court reasoned, could help the factfinder "filter out the unprotected, factual elements of the Article and [*Maverick*] to assess whether they are substantially similar."

As to the contract claim, the district court construed the agreement to include two conditions for crediting Yonay in a movie produced by Paramount: that the movie was (1) produced under the agreement and (2) "substantially based upon or adapted from" the article. Because *Maverick* was not produced under the agreement, the court concluded, Paramount was not required to credit Yonay.

The Yonays appeal. We review the district court's grant of summary judgment de novo. *See Teradata Corp. v. SAP SE*, 124 F.4th 555, 572 (9th Cir. 2024).

II

To establish copyright infringement, plaintiffs must show that (1) they own a valid copyright in a work and (2) the defendant copied original aspects of the work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Only the second element is at issue in this case, and really only part of it: Paramount argues that the Yonays have not shown that anything copied from the article was original—in other words, that they have not shown "unlawful appropriation." *Skidmore as Tr. for Randy Craig*

*Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc).

Copyright protection does not "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "Thus, a defendant incurs no liability if he copies only the 'ideas' or 'concepts' used in the plaintiff's work." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled in part on other grounds by Skidmore*, 952 F.3d at 1068–69. And, of particular relevance here, copyright law also does not protect the facts set forth in a work, so a defendant is not liable for copying them. *Feist*, 499 U.S. at 346–48; *accord Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) ("No author may copyright his ideas or the facts he narrates."). "[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Feist*, 499 U.S. at 349–50.

To show unlawful appropriation, plaintiffs must therefore demonstrate that the works in question share "substantial similarity in *protectable* expression," not merely in facts, ideas, or concepts. *Skidmore*, 952 F.3d at 1064 (emphasis added). To do so, they must satisfy both an extrinsic test and an intrinsic test. *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018). The extrinsic test "assesses the objective similarities of the two works." *Rentmeester*, 883 F.3d at 1118. The intrinsic test is subjective and tests "for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008) (quoting *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d

1435, 1442 (9th Cir. 1994)). Because "the intrinsic test is reserved exclusively for the trier of fact," only the extrinsic test is relevant at the summary-judgment stage. *Williams*, 895 F.3d at 1119.

"[W]hen applying the extrinsic test, a court must filter out and disregard the non-protectible elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). For literary works, "[t]he test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Id.* (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)).

But even if none of the artistic elements in those categories reveals substantial similarity, works can be substantially similar if they share the "selection and arrangement" of those elements—or, in other words, "the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design." *Skidmore*, 952 F.3d at 1074; *see Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 943 (9th Cir. 2023). For a "selection-and-arrangement" claim to succeed, the elements themselves need not be protectable. Rather, "a copyright plaintiff may argue 'infringement . . . based on original selection and arrangement of unprotected elements.'" *Skidmore*, 952 F.3d at 1074 (omission in original) (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002)); *see also Metcalf*, 294 F.3d at 1074 ("The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element.").

We first evaluate the Yonays' arguments about individual elements of the works and then consider their argument based on selection and arrangement.

A

The Yonays contend that there are similarities in each of the categories of elements described in our cases: plot, sequence of events, characters, dialogue, themes, mood, setting, and pace. We agree with the district court that the Yonays cannot show meaningful similarities in any of those categories.

Before considering the individual categories, however, we observe a problem that pervades the Yonays' arguments: Although "Top Guns" contains much original, protected expression—most notably, its vivid phrasing and innovative structure—none of that expression appears in *Maverick*. The Yonays identify similarities between the article and the film only by describing both works at such a high level of abstraction that the similarities do not involve protected expression. Their claim of substantial similarity fails because what is protected is not similar, and what is similar is not protected.

*Plot and Sequence of Events*: We are not sure it is accurate to characterize "Top Guns" as having a "plot" in the conventional sense—it is a nonfiction work, and the portions of the article that describe specific events do so in a nonlinear way that is repeatedly interrupted by historical and descriptive digressions. The article describes the various planes used by Navy fighter pilots, recounts how pilots learn to fly, explains the origin of the Top Gun program, and includes detailed descriptions of a flight simulator and Yonay's own experience in a fighter plane. To the extent there is a plot, it is Yogi and Possum's journey: They complete flight school and meet while going through fighter-pilot training; they are deployed on an aircraft carrier; they are sent to Top Gun as students and proceed through the

school's curriculum; and they graduate and are deployed again.

*Maverick*, by contrast, has a traditional plot with exposition, climax, and denouement. Apart from a short flashback that shows scenes from the original *Top Gun*, the entire story is presented in chronological order. Maverick begins as a test pilot and then is sent to Top Gun as an instructor. Dramatic tension builds as Maverick and Rooster argue with each other, the pilots are unable to complete the training course, and Maverick and Penny pursue a romantic relationship. The plot culminates in the successful completion of the mission, Maverick and Rooster's escape from enemy territory, their reconciliation, and Maverick and Penny's flight into the sunset.

*Maverick* includes many significant plot elements that are absent from "Top Guns." The movie has a main character who returns to Top Gun to train younger pilots to complete a specific mission, rather than the general training that normally characterizes the program; it includes a romantic subplot; and around a quarter of the movie shows the actual mission being carried out. Conversely, "Top Guns" contains historical and technical discussions of numerous subjects not addressed in *Maverick*, such as the flight simulators used to train pilots and the origins of the Top Gun program.

The Yonays argue that those differences are irrelevant to the analysis of substantial similarity. We agree with the general proposition that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (L. Hand, J.). But a plot is simply "the 'sequence of events' by which the author expresses his 'theme' or 'idea.'" *Shaw v. Lindheim*, 919 F.2d 1353, 1363

(9th Cir. 1990) (quoting 3 Melville B. Nimmer, *Nimmer on Copyright* § 13.03[A] (1989)), *overruled in part on other grounds by Skidmore*, 952 F.3d at 1068–69. The more that events are added to or subtracted from that sequence, the less that the plots can reasonably be described as similar, even if there is some overlap. *Cf. Woodland v. Hill*, 136 F.4th 1199, 1211 n.4 (9th Cir. 2025) (noting that "courts may identify differences in the works to explain why there is no substantial similarity").

At oral argument, the Yonays emphasized that *Maverick* "lift[s] certain things" from "Top Guns," including the fact that the F-14 "swings back its wings so that it can . . . do a short takeoff"—a feature that becomes relevant to the plot when Maverick and Rooster take off in a stolen F-14 to escape enemy territory. But the F-14 is a real plane with variable-sweep wings. *See Jane's All the World's Aircraft 1983-84*, at 392 (John W.R. Taylor ed., 1983) (noting that "[t]he configuration of the F-14 includes variable geometry wings" with "20° of leading-edge sweep in the fully forward position and 68° when fully swept"). The evocative language that "Top Guns" uses to describe the aircraft's design—that its "wings can sweep back for fast flying or open to the sides like an eagle's for landing or just for cruising around"—does not appear in *Maverick*. And the basic facts of the design do not enjoy copyright protection. *See Feist*, 499 U.S. at 349 ("No matter how original the format, however, the facts themselves do not become original through association.").

The Yonays also contend that both works "journey through what it takes to be the best of the best in fighter aviation by following the demanding, intense lives of fighter pilots." It is true that both "Top Guns" and *Maverick* depict fighter pilots training at Top Gun and then being deployed. But that similarity is a factual one: Top Gun is a real program

in which the best fighter pilots undergo a demanding, intense training regimen and are then deployed.

The Yonays describe various other alleged plot similarities, such as "focus[ing] on a small, elite group of pilots who are bound together by their shared experiences and sacrifices in a high-stakes environment," "emphasiz[ing] the importance of rigorous training," and "capitaliz[ing] on the fighter jocks' 'frat-house' culture." But even if those similarities exist, they involve only unprotected ideas, not protected expression.

*Characters*: No character described in "Top Guns" appears in *Maverick*. In both works, of course, many of the characters are Top Gun instructors and trainees. But in a work about Top Gun, using instructors and trainees as characters is hardly original. In any event, the characters in the article are real people, and "[a] character based on a historical figure is not protected for copyright purposes." *Corbello v. Valli*, 974 F.3d 965, 976 (9th Cir. 2020).

The Yonays point to the article's "expressive characterizations" of the real Top Gun trainees. They highlight, for example, its description of the trainees in a bar: "[T]hese supremely healthy young males are standing around in twos and threes and talking about" a training flight while ignoring the dancing women "waving right in front of their eyes." Those descriptive phrases are entitled to copyright protection: Although ideas and facts themselves are not protectable, "the specific details of an author's rendering of ideas" and facts are. *Corbello*, 974 F.3d at 975 (quoting *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006)). But none of the quoted phrases appears in *Maverick*. The Yonays instead argue that *Maverick* copied general traits from the article's

characters—for example, that the film depicts pilots as "men's men" who are "jocular, confident, competitive . . . , good-humored and deeply committed." Like the Yonays' asserted plot similarities, those traits are too general to be protectable. *See Biani v. Showtime Networks, Inc.*, 153 F.4th 957, 965 (9th Cir. 2025).

*Dialogue*: It is unclear that any of the dialogue in "Top Guns" is protectable, given that the article presents all of that dialogue as real statements of real Top Gun instructors and trainees. *See Corbello*, 974 F.3d at 978 ("[E]lements of a work presented as fact are treated as fact."). Regardless, none of the dialogue in "Top Guns" appears in *Maverick*—with the exception of the two-word phrase "fight's on," something that real fighter pilots say before beginning training exercises.

Faced with the lack of similarity in dialogue, the Yonays again resort to abstraction, arguing that "the characters in both Works speak in a way that is at once droll, idiomatic, techy, and charmingly unguarded." Assuming that description to be accurate, it is too general to be protectable.

*Theme, Mood, Setting, and Pace*: While the Yonays articulate similarities beyond the plot, characters, and dialogue in the works, we have never held that elements outside of those categories, on their own, can give rise to substantial similarity. *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13D.19[D] (2025) ("[M]ood, setting, and pace, standing alone, would not seem able to attract [copyright] protection."). Either way, the Yonays' arguments about theme, mood, setting, and pace should by now sound familiar. They point, for example, to the colorful language that "Top Guns" uses to describe the Navy base: "At night the darkened base could be mistaken

for an old *From Here to Eternity* set," and "it looks like a small desert town out of the 1950s." But in *Maverick*, no one compares the Navy base to a movie set or a desert town. The Yonays assert that those comparisons reveal shared themes of "post-WWII nostalgia" and "romanticism of a simpler era," but nostalgia for a simpler time is an unprotectable idea—as are the other purportedly shared themes and moods, such as "the anachronism of fighter aviation," "that success comes down to the pilot, rather than his aircraft," "ideological rifts in the Navy," "'Western' gunslinger themes," "the constant threat of death and violence," and the contrast between "freedom" in the sky and "restless[ness]" on the ground.

As for setting, "Top Guns" described Naval Air Station Miramar, which at the time was the location of the Top Gun program, while *Maverick* takes place at Naval Air Station North Island. Despite that difference, the Yonays argue that because both bases are in San Diego, the works "feature the same topography, including the desert, Pacific Ocean, and beaches of California." Those geographic similarities, however, are simply features of the original location of the real program.

The Yonays' arguments about pace fare no better. They say that "Top Guns" and *Maverick* share an "alternation between the aerial ballet, at once lyrical and violent, juxtaposed against quiet, reflective scenes on the ground." Assuming that description to be accurate, alternation between scenes in flight and scenes on the ground reflects nothing more than the reality that fighter pilots in training do not spend 100 percent of their time in the air but also spend time on the ground reviewing past flights or preparing for future ones. Those facts about pilot training are not protectable.

B

Given the lack of similarity in protectable elements, the Yonays understandably focus on a selection-and-arrangement argument. "[A] selection and arrangement copyright protects . . . the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design." *Skidmore*, 952 F.3d at 1074. We consider selection-and-arrangement arguments because of the possibility that the original expression a defendant has copied from a plaintiff cannot be categorized as one, or even a combination, of plot, themes, dialogue, mood, setting, pace, characters, or sequence of events. But although "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element," *Metcalf*, 294 F.3d at 1074, that particular sequence must be original, *see Feist*, 499 U.S. at 349. To assert a selection-and-arrangement argument, a copyright plaintiff must identify "a combination of . . . elements . . . numerous enough" and with a "selection and arrangement original enough that their combination constitutes an original work of authorship." *Skidmore*, 952 F.3d at 1074 (quoting *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003)). Then, the plaintiff must show that the defendant's selection and arrangement is substantially similar to the plaintiff's. *Id.* at 1075.

The Yonays assert that the district court erred by "compar[ing] the Works' selection and arrangement of *only* 'unprotected elements,'" because "selection and arrangement analysis must consider *all* elements, protected and unprotected." We agree that an original selection and arrangement could include both protectable and unprotectable elements, and in such cases, a court should compare the selection and arrangement of all the elements.

But to the extent the Yonays are arguing that a plaintiff can prevail under a selection-and-arrangement theory simply by showing that the two works share many similar elements, whether unprotectable or protectable, their argument reveals a misunderstanding of the extrinsic test.

As we have explained, a court applying the extrinsic test must filter out the unprotected elements. "'Filtering' and 'selection and arrangement' are not truly distinct tests." *Hanagami*, 85 F.4th at 942 n.11. Both ask whether the defendant has copied something other than unprotectable elements. Filtering means that in addition to identifying the "articulable similarities" in the specific objective elements of the works in question, *Cavalier*, 297 F.3d at 822 (quoting *Kouf*, 16 F.3d at 1045), a court must also "determine whether the similar elements are protectable or unprotectable," *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 913 (9th Cir. 2010). Only then can it be assured that "the *protectable elements, standing alone*, are" what is "substantially similar." *Corbello*, 974 F.3d at 975 (quoting *Funky Films*, 462 F.3d at 1077).

To be sure, protectable expression can be, and often is, composed of smaller, unprotectable elements. A plot, for instance, is simply a combination of events. *See Shaw*, 919 F.2d at 1363. Although no discrete event that makes up a plot is itself protectable, a court cannot simply ignore all the unprotectable events, or it would be unable to identify the plot. In other words, even after a court filters out unprotectable elements, it may still consider those elements to the extent that they are constituent parts of protectable categories of expression.

Selection-and-arrangement analysis works the same way. A selection and arrangement of elements can be

original and protectable, whether or not the elements themselves are protectable. When comparing two works' selection and arrangement of elements, a court cannot blind itself to the elements, but similarities in those elements alone—no matter their quantity or importance to the work— cannot demonstrate unlawful appropriation. Instead, to be substantially similar, the works must share a "pattern, synthesis, or design" that is both "particular" and "coherent." *Skidmore*, 952 F.3d at 1074.

The Yonays identify no such shared pattern of expression here. As with their argument about individual elements, the Yonays identify multiple factual similarities between the works when discussing selection and arrangement: for example, that "only the best of the best get invited back to Top Gun as instructors," that "pilots live in a communal world," that the program involves "grueling training," and that lieutenants "carous[e] at the bar, which has a big brass bell and where those who break 'house rules' must buy a round for everyone." But those are unprotectable facts about the Top Gun program, and a copyright plaintiff "cannot establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same elements also appear in the defendant's work, in a different aesthetic context." *Skidmore*, 952 F.3d at 1075; *see also Corbello*, 974 F.3d at 974 n.2 (rejecting a selection-and-arrangement theory where the works depicted shared factual elements "from different perspectives, with different characterizations of the people involved, in different media, and communicating a different overall message").

The Yonays attempt to articulate patterns that the works share, but the patterns they describe are not the original expression in Yonay's copyrighted article. For example,

they point out that "[r]ather than offer an encyclopedic narration of the naval base's operations, Yonay focused on the personal backgrounds and idiosyncrasies of ambitious fighter pilots to engage his audience and humanize" the characters in "Top Guns." They assert that Yonay "patterned contradictory character elements to engage his audience and enhance his Story: e.g., pilots are fierce, but playful; regimented, but irreverent; macho, but sensitive." And they say that, in both works, "passages of idyllic flying over the beach in Southern California are juxtaposed suddenly and violently with gut-wrenching climbs, dives, and dogfights," causing "beauty and terror" to "spring from each other."

Those abstract ideas are not the article's original expression. Showing characters' backgrounds and personalities, giving them contradictory traits, and displaying action in aesthetically pleasing places have all been done before. And even if they had not, the Yonays "cannot claim an exclusive right to ideas or concepts at that level of generality, even in combination. Permitting [them] to claim such a right would withdraw those ideas or concepts from the 'stock of materials' available to other artists, thereby thwarting copyright's 'fundamental objective' of 'foster[ing] creativity.'" *Rentmeester*, 883 F.3d at 1123 (second alteration in original) (first quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[B][2][a] (2017); and then quoting *Warner Bros. Inc. v. American Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983)); *see also Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.) ("Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. . . . [B]ut there is a point in this series of abstractions where they are no longer protected,

since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.").

In the face of a lack of substantial similarity, the Yonays emphasize that "Top Guns" contains significant amounts of original expression. But the expressive nature of the article shows merely that the work receives full copyright protection and that the substantial-similarity standard applies—in contrast, for example, to "paint[ing] a red bouncy ball on blank canvas," where "there's only a narrow range of" possible expression, so "a work must be 'virtually identical' to infringe." *Mattel*, 616 F.3d at 914 (quoting *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446–47 (9th Cir. 1994)). The question under the extrinsic test is whether the expression in *Maverick* is substantially similar to the original expression in "Top Guns," and it is not.

## III

We next evaluate the Yonays' challenge to the district court's decision to exclude their expert and allow Paramount's expert. The proponent of expert testimony must demonstrate that, among other things, "the testimony is the product of reliable principles and methods" and "will help the trier of fact." Fed. R. Evid. 702; *see generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). We review the district court's application of that standard for abuse of discretion. *See United States v. Benavidez-Benavidez*, 217 F.3d 720, 723 (9th Cir. 2000). We see none.

The Yonays sought to introduce a report from Henry Bean, a screenwriter and film professor who opined that *Maverick* is substantially similar to "Top Guns." The district court determined that Bean's testimony would be unhelpful because he "fail[ed] to filter out the elements of the [works]

that are not protected by copyright law." Indeed, in his report and deposition, Bean disclaimed any effort to filter unprotectable elements, taking the position that there was "maybe nothing in" the article "that was . . . an unprotectable element." He believed that "to the extent" the article "conveys facts, those facts are expressed with the feeling of fiction" and that nothing in the article "constitutes a naked 'fact,' unfiltered through Yonay's sensibility." He also stated that while, "in an intuitive way," he "was doing some" filtering, he "was not sitting there thinking, well, this goes in the protected bucket and that goes in the unprotected bucket." The Yonays emphasize Bean's post-deposition declaration that he "believe[s] that [he] considered the expression of facts as opposed to the underlying facts themselves" and that he "tried as best as [he] could to compare the elements of the works at issue that are protectable, while disregarding those that are not," but the district court was not required to credit those qualifier-heavy statements in assessing the reliability of his methodology.

That is particularly so because Bean's general approach was reflected in the specifics of his report, which focused heavily on similarities in unprotectable elements. Bean devoted much of his report to highlighting similar facts, such as the presence of a brass bell hung in a bar near the real-life location of Top Gun, the fact that Top Gun training is difficult, the fact that the best Top Gun students are invited back as instructors, the appearance of a plane's radar screen, and the effect on pilots of g-forces.

Bean also highlighted similarities in abstract ideas. For instance, Bean wrote that Yonay gave Yogi and Possum "a problem . . . they will have to overcome" by opening "Top Guns" with their failure in a training flight. So too, he asserted, does Maverick have to overcome Goose's death.

He explained that "Top Guns" and *Maverick* are similar in that "both follow the recurring theme of the 'redemption' of a hero who is thwarted by his limitations (internal and external) but finally overcomes them and triumphs." If an author could lay claim to the concept of a protagonist's overcoming obstacles to achieve his goal, someone should have told Homer. *See The Odyssey* 1.1–.7 (Emily Wilson trans., W.W. Norton & Co. 2018) (describing "a complicated man" and "the pain he suffered" in achieving his goal of returning home). The district court did not abuse its discretion when it determined that Bean's focus on unprotectable elements made his findings of similarity unhelpful.

The Yonays further argue that, having excluded Bean, the district court erred by granting summary judgment on substantial similarity without the aid of literary experts. But the Yonays' failure to proffer an admissible literary expert was no one's fault but their own. Where, as here, copyright plaintiffs have not produced evidence creating a material dispute over substantial similarity, a court need not give them another chance to find an expert for trial.

Even if the district court had allowed Bean's testimony, it would not have created a material factual dispute. As district courts in this circuit have correctly recognized, "the existence of dueling expert reports does not necessarily present a triable issue of fact for the jury" on substantial similarity. *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1062 (C.D. Cal. 2010); *see, e.g.*, *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1179–80 (9th Cir. 2003) (affirming summary judgment for the defendant on substantial similarity in the face of dueling expert reports), *overruled on other grounds by Skidmore*, 952 F.3d 1051; *accord Gray v. Hudson*, 28 F.4th 87, 97–103 (9th Cir. 2022).

Here, Bean's report does not point out any similarities that would cause us to revise our conclusion that *Maverick* and "Top Guns" do not share substantial protectable expression.

For its part, Paramount proffered expert reports from Andrew Craig, a Navy Reserve officer and former Top Gun instructor who opined that the article's portrayal of the program is factually accurate. The Yonays argue that Craig's opinions were "a mere conduit for hearsay" and were unhelpful because they spoke to the "nonissue" of whether the facts in "Top Guns" were copyrightable. But "experts are entitled to rely on hearsay in forming their opinions." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 873 (9th Cir. 2001). And although neither party disputes that facts are unprotectable, it was reasonable for the district court to perceive a need for expert assistance to "filter out the unprotected, factual elements of the Article." The district court therefore did not abuse its discretion by considering Craig's reports.

IV

Finally, we consider whether Paramount breached its 1983 agreement with Yonay by not crediting him in *Maverick*. The relevant provision of the agreement requires Paramount to credit Yonay in "the film of any motion picture photoplay that may be produced by it hereunder and substantially based upon or adapted from [the article] or any version or adaptation thereof, substantially incorporating the plot, theme, characterizations, motive and treatment of said work or any version or adaptation thereof." The agreement thus requires Paramount to credit Yonay in a film if two separate conditions are satisfied: (1) the film must be "produced by [Paramount] hereunder," and (2) it must be "substantially based upon or adapted from" either the article

or "any version or adaptation" of the article; that is, it must "substantially incorporat[e] the plot, theme, characterizations, motive and treatment of" the article or "any version or adaptation" of it.

Paramount did not breach the agreement because the first condition was not satisfied. The most natural meaning of the phrase "produced . . . hereunder" is "produced using the rights conferred by this agreement." *See Black's Law Dictionary* 870 (12th ed. 2024) (defining "hereunder" as "[i]n accordance with this document"); *accord Webster's Third New International Dictionary of the English Language* 1059 (2002) ("under this agreement: in accordance with the terms of this document"). Because *Maverick* did not infringe the copyright in "Top Guns," it follows that Paramount did not use that same copyright, which it received through the agreement, to produce *Maverick*. *Maverick* therefore was not produced under the agreement.

The Yonays argue that a film need not satisfy the "produced . . . hereunder" condition so long as it satisfies the "substantially based upon or adapted from" condition. That is incorrect. Because the two parts of the clause are separated by the word "and," they both must be satisfied. The Yonays say, however, that the entire clause is a hendiadys—that is, a figure of speech in which a single idea is expressed through two words joined by "and." For example, if a room is "nice and warm," that does not mean that it possesses the distinct qualities of niceness and warmth, but rather that it is nicely warm.

We assume that in some contexts, the best reading of a legal phrase might be as a hendiadys. *See* Samuel L. Bray, *"Necessary AND Proper" and "Cruel AND Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016).

But the Yonays offer no reason to think that this is one of them. A hendiadys typically involves a pair of single words; we are aware of no examples involving phrases as complex as "produced by it hereunder and substantially based upon or adapted from [the article] or any version or adaptation thereof, substantially incorporating the plot, theme, characterizations, motive and treatment of said work or any version or adaptation thereof." Nor have the Yonays explained what idea they think the clause expresses that could not have been expressed by simply omitting "produced by it hereunder." "A contract term should not be construed to render some of its provisions meaningless or irrelevant." *Orr v. Petersen* (*In re Estate of Petersen*), 34 Cal. Rptr. 2d 449, 458 n.4 (Ct. App. 1994). And, most importantly, nothing in the context of the agreement suggests any reason to depart from "[t]he ordinary and usual usage of 'and,'" which "is as a conjunctive." *People v. C.H.* (*In re C.H.*), 264 P.3d 357, 361 (Cal. 2011).

Both conditions in the agreement must be satisfied to trigger the requirement that Paramount credit Yonay. Because the first was not, Paramount did not breach the agreement.

**AFFIRMED.**